662 So.2d 620 (1995)
Richard D. BEARDEN
v.
STATE of Mississippi.
No. 92-KA-00215-SCT.
Supreme Court of Mississippi.
October 5, 1995.
*621 V.W. Carmody, Stanfield Carmody & Clark, Jackson, for appellant.
Michael C. Moore, Attorney General, Deirdre McCrory, Special Ass't Attorney General, Jackson, for appellee.
Before HAWKINS, C.J., and SULLIVAN and SMITH, JJ.
HAWKINS, Chief Justice, for the Court:
Bearden was convicted May 7, 1991, in the Justice Court of Sunflower County of the crime of driving under the influence of intoxicating liquor. He appealed this conviction to the circuit court of Sunflower County, and was again convicted in a non-jury trial before a circuit judge February 10, 1995, and fined $500. We affirm.

FACTS
In the early morning hours of April 7, 1991, Bearden was involved in a two-car accident on Highway 49 near Inverness in Sunflower County. The first person to arrive at the scene of the accident was emergency medical technician David Beacham. At the trial, Beacham testified that:
I observed Mr. Bearden sitting there  he was sitting in his car in the driver's seat. Uh  he had a large abrasion I believe it was on his forehead. And I did my assessment of him, and I determined that he had no threat to his life at that time... . I escorted Mr. Bearden to the ambulance. He ambulated on his own. Once I got him in the ambulance, I did a complete secondary survey, and when I put him in the ambulance, I could detect there was a strong odor of alcohol in the ambulance.
As to Bearden's appearance, Beacham stated that, "Well, he was in quite a bit of pain. His eyes were red; his speech was slurred; but to say that he was intoxicated, I can't say that. I can say there was the presence of alcohol smell itself." Bearden was taken by ambulance to South Sunflower County Hospital.
*622 Mississippi Highway Patrol Trooper Tim Pyles arrived at the scene after Bearden had left and interviewed Ruth Pittman, the driver of the other car involved in the accident. Pyles also examined Bearden's car and found it to smell strongly of alcohol. He later concluded that Pittman was driving her car south on Highway 49 when the north-bound Bearden crossed over into her lane and collided with her just across the center line.
After concluding his examination of the accident site, Pyles went to the hospital to talk to Bearden:
I asked Mr. Bearden if there was anybody else in the car. He told me no. There was a strong smell of alcoholic beverage coming from Mr. Bearden. His eyes were red and runny, dilating; speech was very slurred. I asked Mr. Bearden if he would consent to having blood taken to do a blood alcohol test, and he answered, no, I will not.
Later, Bearden changed his mind and agreed to have some blood drawn for a blood alcohol test. After he signed a consent form so stating, a lab technician took the sample using a blood alcohol test kit. Pyles took Bearden's blood, sealed it in the test kit, and kept it in his possession until he mailed it to the State Crime Lab in Jackson. Soon after the blood sample was taken, Pyles issued Bearden a citation for driving under the influence of alcohol. Pyles specifically testified that Bearden committed this offense in Sunflower County, Mississippi, and that he based his belief that Bearden was intoxicated on Bearden's slurred speech and the strong smell of alcohol.
There was some dispute at the trial as to whether Pyles made an actual arrest. On direct examination Pyles stated that he arrested Bearden. However, this testimony contradicts statements given by Pyles under questioning by Judge Evans:
Q. Officer, at what point did you inform Mr. Bearden that you were charging him or put him under arrest? Just tell me what you went through.
A. After I followed [sic] the accident report, which is a uniform accident report, in talking to Mr. Bearden, I asked him if he would consent to giving blood, and he said, no, and I said, that's fine. I left the room and came back. He said that he would consent to giving blood. After his blood was taken, I told Mr. Bearden that he was charged with driving under the influence of alcohol. I had already determined that I was going to charge him with driving 
Q. Well, did you actually place him under arrest or just inform him that he was going to be charged?
A. I informed him that he was going to be charged. I had already asked the doctors if they were going to keep him.
Q. Had he told you at that time that he was driving the car?
A. Yes, sir, he had, in questioning about the accident and following the accident report.
Q. And you never placed him under arrest and put him in jail or anything like that; just issued, I assume, this citation?
A. Yes, sir.
The citation issued to Bearden was an uniform driving under the influence traffic ticket. The heading of the ticket reads in part "State of Mississippi County of Sunflower." The location is listed as "Inverness," the district is listed as "2," and the highway/street is listed as "49." The citation asserts "That the aforesaid person [Bearden] did unlawfully and willfully operate a motor vehicle within this state: Under the influence of intoxicating liquor in violation of Section 63-11-30(1)(a); Miss. Code Ann. (1972)." The citation goes on to say, "Further, affiant states that he or she has probable cause to believe, and does believe, the person named above committed the offense herein set forth, contrary to law." Trooper Pyles signed the ticket directly beneath this language in a blank labeled, "AFFIANT/OFFICER'S SIGNATURE." Finally, underneath Pyles's signature the citation states, "SWORN TO BEFORE ME, THIS THE 9 DAY OF April, 1991." Below this is a blank labeled "(NAME AND TITLE)" signed by Elaine *623 Campbell with the word "Clerk" handwritten beneath her signature.
April Frierson, medical lab technician, drew Bearden's blood. At the trial she testified in some detail as to the procedure she followed in getting Bearden's sample and in transferring it to the Highway Patrol. Frierson also stated that on the night that she took his blood sample Bearden was in severe pain and, "had a very bad attitude. Also, there was a smell of alcohol."
Anna Ezell, a supervisor at the Mississippi Crime Laboratory, was certified as an expert at the trial and testified about the techniques used by the Crime Lab to analyze blood samples. According to Ezell, following standard operating procedures, she performed a number of tests on Bearden's blood sample. When asked if this procedure had been approved by the Mississippi Highway Patrol, she spoke the words "It's been approved" before she was interrupted by a defense counsel objection. Ezell also testified about the procedures used to care for the lab's alcohol testing machines:
Q. (By Prosecuting Attorney Jane McWilliams) Ms. Ezell, tell us what procedures have been done on the machinery in the last few months.
A. Uh  this instrument, unlike the breath instruments, which are maintained and checked quarterly, and we check it, I think, every thirty days, but this instrument is actually and physically within the Crime Lab, and the performance is checked every time a sample is run.
Q. Did you check this machine before you ran this sample?
A. Yes, I did. With every run, three control standards are run in the beginning, but before any suspect sample is run, we run three standards to make sure it's working right and then every five cases that is run, the standards are checked to insure that the instrument is performing properly, so there is continuing check on the function of this instrument.
According to Frierson the Crime Lab's tests showed Bearden's blood sample to have an ethyl alcohol content of 0.15 percent.
At the end of the trial, Judge Evans found Bearden guilty of driving under the influence and levied a $500 fine and court costs. Bearden appealed to this Court on March 6, 1992.

LAW

I. PROBABLE CAUSE
The first issue raised by Bearden on appeal is whether the arresting officer lacked sufficient probable cause to legally arrest him. However, before this Court can address the question of the legality of Bearden's arrest, it must first determine whether Bearden was in fact arrested. "An arrest is not consummated until there has been a taking of possession of a person by manual caption, or submission on demand; and although a manual touching is unnecessary unless there is resistance to an arrest, there must be restraint of a person to establish an arrest." Bayse v. State, 420 So.2d 1050, 1051-52 (Miss. 1982) (quoting Fondren v. State, 253 Miss. 241, 175 So.2d 628 (1965)). The need for the restraint of the person arrested is also developed in the definition of arrest found in the second edition of American Jurisprudence.
To effect an arrest, there must be actual or constructive seizure or detention of the person arrested, or his voluntary submission to custody, and the restraint must be under real or pretended legal authority. There can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint.
5 Am.Jur.2d Arrest § 1 (1962).
Here, Pyles and Bearden met for the first time at the hospital. Pyles talked to Bearden about the accident and requested a blood sample. After Bearden refused, Pyles asked a few questions and left the room. Pyles then returned to the room and asked another question. At that point, Bearden agreed to give a blood sample. After the lab technician took the sample, Pyles told Bearden that he was charged with driving under the influence and issued Bearden a citation.
*624 The record is devoid of any evidence of Pyles placing Bearden in "actual or constructive seizure or detention" or of Bearden's "voluntary submission to custody." Simply put, under the doctrines of Bayse and Fondren, this "arrest" was not consummated. It follows that if there was no arrest, Bearden's assignment of error premised on an improper arrest must fail.
Next, Bearden claims that the medical records which documented Bearden's stay at South Sunflower County Hospital and the testimony of the hospital's employees were both inadmissible.
Bearden's basic argument is that April Frierson and David Beacham based their testimony on inadmissible hospital records and, therefore, it too should be inadmissible. However, Bearden offers no proof that Frierson and Beacham did so base their testimony. Furthermore, by their own testimony, one could conclude they remembered the events surrounding Bearden's hospital stay. Without further proof, Bearden's assertion that the disputed testimony had to have been based on the inadmissible records is speculation. The admission of the hospital employees' testimony by the lower court was therefore correct.
Bearden next claims that the prosecution failed to show that the proper procedure was followed by the state crime lab. Miss. Code Ann. § 63-11-19 reads in part:
A chemical analysis of the person's breath, blood or urine, to be considered valid under the provisions of this section, shall have been performed according to methods approved by the State Crime Laboratory created pursuant to Section 45-1-17 and the Commissioner of Public Safety and performed by an individual possessing a valid permit issued by the State Crime Laboratory for making such analysis. The State Crime Laboratory and the Commissioner of Public Safety are authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the State Crime Laboratory... .
The State Crime Laboratory shall make periodic, but not less frequently than quarterly, tests of the methods, machines or devices used in making chemical analysis of a person's breath as shall be necessary to ensure the accuracy thereof, and shall issue its certificate to verify the accuracy of the same.
Miss. Code Ann. § 63-11-19 (Supp. 1994).
In Estes v. State, 605 So.2d 772 (Miss. 1992), we held that the results of a breath intoxilizer test were admissible when the officer who performed the test substantially complied with § 63-11-19. It follows that substantial compliance with the statute must also be necessary in the performance of blood tests such as the one featured in the case at bar.
Bearden argues that the Mississippi Crime Lab did not comply with § 63-11-19 and that the blood test performed by them should therefore not be admitted. To show that this statute was properly followed, the prosecution had Anna Ezell, a supervisor at the Mississippi Crime Lab, testify about the Lab's testing procedures. According to Ezell, she performed a number of elaborate tests on Bearden's blood sample which followed the standard operating procedure of the Mississippi Crime Laboratory. Furthermore, when asked if this procedure had been approved by the Mississippi Highway Patrol, she spoke the words "It's been approved" before she was interrupted by a defense counsel objection. Finally, Ezell also discussed the ways in which the testing machinery was cared for and maintained:
Q. (By Prosecuting Attorney Jane McWilliams) Ms. Ezell, tell us what procedures have been done on the machinery in the last few months.
A. Uh  this instrument, unlike the breath instruments, which are maintained and checked quarterly, and we check it, I think, every thirty days, but this instrument is actually and physically within the Crime Lab, and the performance is checked every time a sample is run.

*625 Q. Did you check this machine before you ran this sample?
A. Yes, I did. With every run, three control standards are run in the beginning, but before any suspect sample is run, we run three standards to make sure it's working right and then every five cases that is run, the standards are checked to insure that the instrument is performing properly, so there is continuing check on the function of this instrument.
While Ezell did not testify that she possessed a valid permit issued by the Crime Lab which would enable her to perform tests under § 63-11-19, she did state that she had been working for the State Crime Lab for 13 years and had analyzed thousands of blood alcohol samples, clearly establishing her expertise in this field, all without an objection from the defense. Unquestionably, she was qualified to perform these tests. While also true that Ezell did not specifically testify that the Crime Lab or the Commissioner of Public Safety had approved the methods they used to test blood samples, nevertheless her testimony that the procedures used on Bearden's blood were the Crime Lab's standard operating procedures proved that the Crime Lab approved of them. Finally, she testified that these procedures had the approval of the Mississippi Highway Patrol.
The record does not reflect that the Mississippi Crime Lab precisely followed the tenets of § 63-11-19. Nevertheless, the State showed that the Crime Lab did substantially comply with the statute and under Estes that is all that is required. There was no error in admitting Ezell's testimony.

II. JURISDICTION
As his next assignment of error, Bearden cites four reasons the lower court was without jurisdiction to try this case. First, Bearden claims that the affidavit was not sworn to. An examination of the ticket/affidavit shows this assertion to be unfounded. Pyles signed the ticket in a blank labeled "AFFIANT/OFFICER'S SIGNATURE" and under words which state, "Further, affiant states that he or she has probable cause to believe, and does believe, the person named above committed the offense herein set forth, contrary to law." Furthermore, beneath Pyles's signature the ticket/affidavit reads, "SWORN TO BEFORE ME, THIS THE 9 DAY OF April, 1991." Below this is a blank labeled "(NAME AND TITLE)" signed by Elaine Campbell with the word "Clerk" handwritten beneath her signature. On its face the ticket was properly signed and sworn to by Trooper Pyles before Elaine Campbell.
Second, Bearden claims the affidavit was defective as it was not sealed. There is no merit to this contention as justice court judges and clerks are not required to place a seal upon affidavits. Miss. Code Ann. § 25-33-17 (1972); Murphy v. State, 164 Miss. 296, 144 So. 699, 700 (1932); Matthews v. State, 134 Miss. 807, 100 So. 18, 19 (1924).
The claim that the State offered no proof of venue is belied by the record, wherein Pyles testified the offense occurred in Sunflower County. (R. 10-11).
Finally, Bearden claims that although the top of the affidavit reads "State of Mississippi, County of Sunflower," it is insufficient because the body of the affidavit does not contain the location of the offense. Again the citation shows on its face that the location was listed as "Inverness" in District 2, on Highway 49. In the first place, the caption of the citation informs Bearden that Sunflower County is the place of the offense. Even if it did not, the fact that the body of the citation shows the offense to have occurred in Inverness, District 2 on Highway 49 sufficiently states venue as this Court will take judicial notice that a certain town is in a given county. Clark v. State, 230 Miss. 143, 146, 92 So.2d 452, 453 (1957); Tillman v. State, 213 Miss. 136, 139, 56 So.2d 91, 92 (1952); see also 22 C.J.S. Criminal Law § 332 (1989).
No further issues merit discussion.
The judgment of the circuit court is affirmed.
CONVICTION OF DRIVING UNDER THE INFLUENCE OF INTOXICATING *626 LIQUOR AND SENTENCE OF A FINE OF $500 AND PAYMENT OF ALL COSTS AFFIRMED.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
McRAE, J., not participating.